John E. Waites, U.S. Bankruptcy Judge
This matter comes before the Court upon the Motion to Amend the Complaint ("Motion to Amend") filed by Frank Scott Dabney and Kathryn Harrelle Dabney ("Plaintiffs") on August 3, 2018. Bank of New York Mellon ("BNYM") and Shellpoint Mortgage Servicing ("Shellpoint") filed a Brief in Opposition ("Brief") to the Motion to Amended on September 11, 2018. In addition, Specialized Loan Servicing ("SLS") filed an Objection to the Motion to Amend ("Objection") on October 12, 2018. No response to the Motion to Amend was filed by Bank of America, N.A.
*557 ("Bank").[1] The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.[2] The Court makes the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52, which is made applicable by Fed. R. Bankr. P. 7052.[3]
FINDINGS OF FACT[4]
1. On May 11, 2006, Plaintiffs executed and delivered to Lendmark Financial Services, Inc. ("Lendmark") an adjustable rate note ("Note") in the original principal amount of $304,000. The Note is secured by a first mortgage lien ("Mortgage") executed and delivered by Plaintiffs to Lendmark on May 11, 2006. The Mortgage encumbers Plaintiffs' principal residence located at 1844 Chelwood Circle, Charleston, SC 29407 ("Property"). Contemporaneous with the execution of the Note and Mortgage, Plaintiffs executed and delivered to Lendmark an Adjustable Rate Rider ("ARR," and together with the Note and Mortgage, the "Loan").
2. The Note obligated Plaintiffs to make 360 monthly installment payments beginning July 1, 2006, with a maturity date of June 1, 2036.
3. For the first thirty-six months, the Note required monthly payments in the amount of $2,230.64 based on an initial interest rate of 8.000%:
3. PAYMENTS
...
(B) Amount of My Initial Monthly Payments. Each of my initial monthly payments will be in the amount of $2,230.64 . This amount may change.
(C) Monthly Payment Changes. Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.
4. Section 4(A) of the Note provides that the interest rate "may" change on the first day of June 2009. The parties dispute whether the Note sets an interest rate floor of 8.000%. Plaintiffs allege that the interest rate should have dropped below 8.000% during the six-month periods after June 2009 when the LIBOR index added to 5.125% totaled less than 8.000% because Section 4(D) of the Note says "[m]y interest rate will never be greater than 14.000%," but it does not mention a minimum rate:
2. INTEREST. Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 8.000% . The interest rate I will pay may change in accordance with Section 4 of this Note. The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default as described in Section 7(B) of this Note.
...
4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates. The interest rate I will pay may change on the first day of *558 June, 2009 and on that day every 6 months thereafter. Each date on which my interest rate could change is called a "Change Date."
(B) The Index. Beginning with the first Change Date, my interest rate will be based on an Index.
...
(C) Calculation of Changes. Before each Change Date, the Note Holder will calculate my new interest rate by adding 5.125 percentage point(s) (5.125% ) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one-percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.
(D) Limits on Interest Rate Changes. The interest rate I am required to pay at the first Change Date will not be greater than 11.00% or less than 8.00% . Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than 1.00 percentage point(s) (1.000% ) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 14.00% .
(emphasis added)
5. Section 4(D) of the Adjustable Rate Rider ("Rider") attached to Plaintiffs' Mortgage contains an additional phrase, which says, "[the] interest rate will never be greater than 14.00% or less than the initial interest rate stated above." Section 4(A) of the Rider defines the initial interest rate: "The Note provides for an initial interest rate of 8.000%." Bank and Former Defendants allege that the Rider therefore sets the parameters for the adjustable interest rate as between 8.000% and 14.000%.
ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:
A. INTEREST RATE AND MONTHLY PAYMENT CHANGES.
The Note provides for an initial interest rate of 8.000% . The Note provides for changes in the adjustable interest rate and the monthly payments, as follows:
4. INTEREST RATE AND MONTHLY PAYMENT CHANGES.
(A) Change Dates. The adjustable interest rate I will pay may change on the first day of June, 2009 and on the same day of every 6 month(s) thereafter. Each date on which my interest rate could change is called the "Change Date."
(B) The Index. Beginning with the first Change Date, my adjustable interest rate will be based on an Index.
...
(C) Calculation of Changes. Before each Change Date, the Note Holder will calculate my new interest rate by adding 5.125 percentage point(s) (5.125% ) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one-percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change *559 Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.
(D) Limits on Interest Rate Changes. The interest rate I am required to pay at the first Change Date will not be greater than 11.00% or less than 8.00% . Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than 1.00 percentage point(s) (1.000% ) from the rate of interest I have been paying for the preceding 6 month(s). My interest rate will never be greater than 14.00%, or less than the initial interest rate stated above.
6. The parties dispute whether the terms of the Note or the Rider control the interest rate minimum. Paragraph 25 of the Mortgage says that the Rider "shall amend and supplement" the Mortgage and Note, referred to as "Security Instrument":
25. Riders to this Security Instrument. If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es) ] (Adjustable Rate Rider is checked).
7. On May 11, 2006, Lendmark assigned the Note to Countrywide Bank, N.A.
8. On or about September 2, 2006, Countrywide Bank, N.A. endorsed the Note to Countrywide Home Loans, Inc.
9. On September 2, 2006, Countrywide Home Loans, Inc. sold and transferred the Note via blank endorsement to CWABS, Inc. On the same day, CWABS, Inc. conveyed all interest in the Note to BNYM as Trustee of the trust for registered holders of CWABS, Inc., Asset-Backed Certificates, Series 2006-17. The master servicer under the Pooling & Servicing Agreement ("Master Servicer") was Countrywide Home Loan Servicing, LP.
10. On April 27, 2009, Bank acquired Countrywide Bank, N.A., and BAC Home Loan Servicing, LP became the Master Servicer
11. On July 1, 2011, Bank became the Master Servicer.
12. On July 25, 2013, Plaintiffs filed a voluntary Petition ("Petition") under Chapter 13 of the Bankruptcy Code, Case No. 13-04227-JW (the "Bankruptcy Case").[5] Plaintiffs were represented by bankruptcy counsel during the entirety of the case.
13. On December 3, 2013, Plaintiffs filed their Fourth Amended Chapter 13 Plan ("Plan").[6]
14. Section IV(B)(3) of the Plan provided for treatment under 11 U.S.C. § 1322(b)(5) to cure the default of the subject note by Plaintiffs' payment of the prepetition arrearage at a rate of $734.00 per month (1/60th of the $44,000 total arrearage) and to maintain regular post-petition direct mortgage payments beginning August 2013.[7]
*560 15. Bank did not file an objection to the Plan, and on December 9, 2013, the Plan was confirmed by Order of the Court.
16. On December 15, 2013, Bank hired SLS to subservice Plaintiffs' Loan. SLS was the sub-servicer of the Loan from December 15, 2013 until December 22, 2016.
17. On February 28, 2014, since Bank did not file a Proof of Claim, Plaintiffs' bankruptcy counsel filed a Proof of the Claim on behalf of Bank pursuant to Fed. R. Bankr. P. 3004 and § 502(a), asserting a prepetition mortgage debt arrearage of $44,000. No party objected to or sought to amend the claim filed by Plaintiffs as debtors and therefore the claim was deemed allowed ("Allowed Claim").
18. On June 5, 2014, Bank filed a Notice of Transfer of Proof of Claim pursuant to Rule 3001(e)(2), wherein Bank indicated that the Allowed Claim was transferred to SLS as Bank's servicing agent.
19. On June 6, 2014, SLS filed a Fed. R. Bankr. P. 3002.1(b) Notice of Mortgage Payment Change ("First Notice"). Therein, SLS indicated that, effective July 1, 2014, the monthly payment on the Loan would change from $2,229.67 to $2,229.66. The First Notice also advised Plaintiffs that the interest rate on the Loan was 8%. Plaintiffs did not file an objection or response to the First Notice.
20. On December 22, 2016, a Transfer of Claim ("Assignment of Claim") was filed indicating SLS transferred the claim to BNYM as Trustee for the Certificateholders of the CWABS Inc., Asset Backed Certificates, Series 2006-17. According to the pleadings, Shellpoint became the servicer at that time and remains the servicer of the Loan.
21. Plaintiffs filed a complaint on March 30, 2017 ("Original Complaint"), commencing the present adversary proceeding. In the Original Complaint, Plaintiffs alleged that Bank, SLS, Shellpoint, and BNYM engaged in various acts of misconduct and systematically overcharged interest to Plaintiffs. Further, Plaintiffs disputed the interest rate that Bank should have charged on the Loan. Plaintiffs alleged three causes of action in their Original Complaint: (1) Violation of the Automatic Stay, (2) Violation of the Automatic Stay, and (3) Contempt of Court.
22. Plaintiffs' first cause of action alleged that the Defendants violated the automatic stay by wrongfully retaining their overpayments, which resulted in their exclusion from the property of the bankruptcy estate.
23. Referring to a foreclosure complaint filed by Bank in the name of BNYM as Trustee in the Court of Common Pleas for the County of Charleston, Plaintiffs' second cause of action alleged that the Defendants violated the automatic stay by withholding possession of property of the bankruptcy estate and by accepting Plaintiffs' mortgage payments because they had no right to enforce the Note and Mortgage.
24. Plaintiffs' third cause of action alleged that Defendants were in contempt of the order of this Court "represented by the automatic stay," and orders entered by other courts. The complaint did not specify which of this Court's orders Plaintiffs believed Defendants violated, and Plaintiffs alleged that Defendants violated the South Carolina Supreme Court's Administrative Order 2011-05-02-01 "in that Defendants have not attempted to reach an agreement for foreclosure intervention in good faith." In addition, Plaintiffs alleged that Defendants made false representations to this Court, including:
a. That SLS is the "holder" of a claim against the Plaintiffs.
*561 b. That SLS is the "servicing agent" that is authorized to bring suit on behalf of BNYM.
c. That as of June 10, 2014, the Plaintiffs were in arrears in the amount of $44,000.
d. That as of June 10, 2014, the Plaintiffs were owing three post-petition payments totaling $6,689.01.
e. That the Plaintiffs owed monthly payments of $2,229.67 from 08/30/2013 to 06/09/2014.
25. On May 1, 2017, SLS filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).
26. On May 11, 2017, Shellpoint and BNYM also filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).
27. On May 15, 2017, Bank filed an Answer to Plaintiffs' Original Complaint.
28. By Order dated July 11, 2017, the Court dismissed the Original Complaint as to BNYM, Shellpoint and SLS ("Former Defendants") without prejudice due to Plaintiffs' failure to comply with the pleading requirements of Fed. R. Civ. P. 8. Plaintiffs did not appeal this Order.
29. On August 11, 2017, Bank filed a motion for judgment on the pleadings.
30. On August 28, 2017, Plaintiffs filed a motion to amend the adversary complaint. Although Plaintiffs sought to rename Former Defendants in their complaint, it does not appear that Plaintiffs served the motion on them or their counsel.
31. After a hearing, the Court entered an Order on November 8, 2017 that: (1) granted Bank's motion for judgment on the pleadings; (2) denied Plaintiffs' motion to amend the complaint as to Bank as futile; and (3) denied Plaintiffs' motion to amend the complaint as to Former Defendants because Plaintiffs failed to serve the motion on Former Defendants.
32. On or about November 20, 2017, Plaintiffs appealed the Court's November 8, 2017 Order to the United States District Court for the District of South Carolina ("District Court") and presented this Court's judgments in favor of Bank. Plaintiffs did not present this Court's judgments as to Former Defendants in their appeal.
33. On April 13, 2018, Plaintiffs received a chapter 13 discharge in their Bankruptcy Case.
34. On May 4, 2018, the Court issued an Order to Discharge Trustee and to close Plaintiffs' Bankruptcy Case because Trustee "certified that the estate of [Plaintiffs'] ha[d] been fully administered."
35. On July 3, 2018, the District Court vacated this Court's November 8, 2017 Order granting judgment as a matter of law for Bank and remanded the case to this Court for further proceedings. The District Court held that, "The loan documents, read together as a whole, are capable of being understood as having an interest rate floor and as not having an interest rate floor. The loan documents therefore are ambiguous and parol evidence might resolve the ambiguity."
36. As to Former Defendants, the District Court noted that, "the Bankruptcy Court denied the motion [to amend] based on Plaintiffs' failure to serve those former defendants with the motion to amend. That issue was not presented in the appeal."
37. On July 24, 2018, at a subsequent status hearing held by this Court, Plaintiffs withdrew without prejudice their motion to amend filed on August 28, 2017.
38. On August 3, 2018, Plaintiffs filed the present Motion to Amend and served all parties, including Bank and Former Defendants. Included with the Motion to *562 Amend was Plaintiff's proposed amended complaint ("Proposed Amended Complaint").
39. On September 11, 2018, BNYM and Shellpoint filed the Brief in opposition to the Motion to Amend.
40. On October 12, 2018, SLS filed the Objection to the Motion to Amend.
41. Bank did not object to the Motion to Amend.
42. A hearing was held on the Motion to Amend at which counsel for all parties except Bank were present.
LEGAL STANDARDS
The grant or denial of an opportunity to amend a pleading before trial is within the discretion of this Court. Fed. R. Civ. P. 15(a)(2)[8] provides that if a party cannot amend its pleadings as a matter of course due to the timing of the proposed amendment, then it may amend its pleading "with... the court's leave. The court should freely give leave when justice so requires." Rule 15(a)(2) does not prescribe a deadline for requesting permission from the Court to amend, and no scheduling order was issued by this Court that would otherwise prohibit Plaintiffs' request to amend their Complaint as untimely.
However, a motion to amend may be denied for futility. Forman v. Davis , 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). An amendment is futile if it "would fail to withstand a motion to dismiss." Woods v. Boeing Co. , 841 F. Supp. 2d 925, 930 (D.S.C. 2012). Former Defendants SLS, Shellpoint, and BNYM contend that Plaintiffs' Motion to Amend is futile based upon a number of theories, and also contend that the claim brought under 12 C.F.R. § 226.20(c) against all Defendants is barred by a one-year statute of limitations.
CONCLUSIONS OF LAW
In requesting to amend their Original Complaint, Plaintiffs seek to rename Former Defendants and to cure the defects in the Original Complaint, which was dismissed without prejudice for failure to state a claim. By Order dated July 11, 2017, the Court dismissed all three of Plaintiffs' original claims against Former Defendants because the Original Complaint failed to satisfy the minimum pleading requirements prescribed by Fed. R. Civ. P. 8. Although Plaintiffs did not appeal this Court's July 11, 2017 Order, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") has held that:
An order dismissing a complaint without prejudice is not an appealable final order under 28 U.S.C. § 1291 if the plaintiff could save his action by merely amending his complaint....[I]n cases in which the district court granted a motion to dismiss for failure to plead sufficient facts in the complaint, we have consistently found...that we lacked appellate jurisdiction because the plaintiff could amend the complaint to cure the pleading deficiency.
Goode v. Central Virginia Legal Aid Society, Inc. , 807 F.3d 619, 623-24 (4th Cir. 2015) (internal citations omitted). Thus, despite Former Defendants' arguments, Plaintiffs' request to amend is not barred by their failure to appeal the prior dismissal order.
Plaintiffs first attempted to amend the Original Complaint on August 28, 2017. However, as to Bank, the Court denied the August 28, 2017 Motion to Amend the Complaint as moot due to the Court's decision *563 to grant judgment on the pleadings in favor of Bank. As to Former Defendants SLS, Shellpoint, and BNYM, the Court denied the prior motion to amend because Plaintiffs failed to serve the motion on Former Defendants or their counsel. Plaintiffs appealed this Court's Order granting the Motion for Judgment on the Pleadings in favor of Bank on November 20, 2017. On July 3, 2018, the District Court vacated this Court's decisions in that Order as to Bank. Plaintiffs did not present this Court's decision to grant Former Defendants' motions to dismiss in their appeal to the District Court.
On August 3, 2018, Plaintiffs served on all four defendants the present Motion to Amend and the Proposed Amended Complaint. The Proposed Amended Complaint renames Former Defendants and contains twenty-two additional paragraphs of facts and seven additional causes of action. Bank has not responded to the Motion to Amend or filed any objections to Plaintiffs' Proposed Amended Complaint. Multiple arguments were raised by Former Defendants in the Objection and Brief, including the statute of limitations defense to Plaintiff's first cause of action.
Plaintiffs' first cause of action against Defendants is for a violation of 12 C.F.R. § 226.20, a regulation that implements the Truth in Lending Act ("TILA") and establishes uniformity in creditors' disclosures to borrowers. 12 C.F.R. § 226.20(c) states, "[a]n adjustment to the interest rate with or without a corresponding adjustment to the payment in a variable-rate transaction subject to § 226.19(b) is an event requiring new disclosure to the consumer." Plaintiffs allege that Defendants violated TILA by sending insufficient or inaccurate disclosures and by failing to send disclosures about the interest rate they should have been paying under their Loan. Former Defendants contend that Plaintiffs should not be permitted to amend the Original Complaint to add this cause of action because the statute of limitations under TILA is one year from "the date of the occurrence of the violation" and Plaintiffs' claim would be based on events that occurred outside of the statute of limitations.
Pursuant to Fed. R. Civ. P. 15(c)(1)(B), "an amendment to a pleading relates back to the date of the original pleading when ... the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out - or attempted to be set out - in the original pleading." The TILA claim Plaintiffs seek to add is based on the disclosures or lack of disclosures that Bank and Former Defendants sent to Plaintiffs informing them of their "Current Monthly Interest Rate" and monthly payment amount, which were set out in the Original Complaint. Therefore, in the Proposed Amended Complaint, it appears that Plaintiffs may raise a claim under TILA for violations that occurred as early as one year before the Original Complaint was filed on March 30, 2017.
In addition, the Assignment of Claim demonstrates that all four Defendants were involved with the servicing of the Loan during the relevant one-year time period prior to March 30, 2017. Therefore, Plaintiffs shall be allowed to amend the Original Complaint as to this cause of action.
Furthermore, the Court has extensively reviewed the remaining arguments raised by Former Defendants in the Objection and Brief, including certain affirmative defenses raised by SLS. However, the record before the Court is somewhat unclear and confusing regarding the relationships between the Defendants and agency and contract issues that may affect liability between the parties. In addition, Defendants at this stage have taken very different *564 procedural approaches to the defense of the Proposed Amended Complaint, which complicates the case. The examination of affirmative defenses by some but not all Defendants may lead to disparate findings and conclusions, complicate the proceeding, increase costs to the parties, and not be in the interest of judicial economy. The Court is convinced that the proceeding, the parties, and the Court could all benefit from the clarity gained through discovery. Therefore, the Court exercises its discretion and grants the Motion to Amend.
CONCLUSION
For the reasons stated above, Plaintiffs' Motion to Amend is granted.
AND IT IS SO ORDERED.

For the purposes of this Order, BNYM, Shellpoint, SLS and Bank will collectively be referred to as "Defendants."

According to the proposed amended complaint included with the Motion to Amend, Plaintiffs consent to the entry of a final order by this Court in the event this adversary proceeding is determined to be non-core.

To the extent the following findings of fact are conclusions of law, they are so adopted; to the extent the following conclusions of law are findings of fact, they are so adopted.

The following are preliminary findings of fact based largely on the parties' pleadings.

Plaintiffs first filed for bankruptcy in 2012, Case No. 12-7250. Their case was dismissed after Plaintiffs failed to attend the meeting of creditors. At the time, Plaintiffs scheduled a mortgage debt with an arrearage of $34,000 owed to Bank.

Earlier versions of the Plan provided for the same treatment of Bank's secured claim.

Further references to the Bankruptcy Code (11 U.S.C. § 101, et seq. ) shall be by section number only.

This rule is made applicable by Fed. R. Bankr. P. 7015.